HANNA *v.* BOARD OF EDUCATION OF WICOMICO COUNTY ET AL.

[No. 165, October Term, 1951.]

50

*Decided April 4, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Stanley G. Robins,* with whom was *Robert P. Cannon,* on the brief, for appellants.

*John W. T. Webb* and *Roszel C. Thomsen,* with whom were *William W. Travers,* and *William B. Somerville,* on the brief, for William F. Sutter, appellee.

Submitted on brief by *Charles E. Hearne, Jr.,* for Board of Education of Wicomico County, appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This suit was brought by Henry H. Hanna, Jr., and Milford W. Twilley, residents and taxpayers of Wicomico County, to enjoin the Board of Education of Wicomico County from constructing four buildings for a high school in the City of Salisbury in accordance with a contract awarded to William F. Sutter, of Nescopeck, Pennsylvania. The Circuit Court held the contract valid and dismissed the bill of complaint. The appeal is from that decree.

On a suit by a taxpayer, a court of equity will not review the exercise of discretion of an administrative agency, if it acts within the scope of its authority, unless its power is fraudulently or corruptly exercised; but the court will restrain an agency from entering into or performing a void or *ultra vires* contract or from acting fraudulently or so arbitrarily as to constitute a breach of trust. *Wiley v. Board of School Com'rs of Allegany County,* 51 Md. 401; *Matthaei v. Housing Authority of Baltimore City,* 177 Md. 506, 9 A. 2d 835; *Castle Farms Dairy Stores v. Lexington Market Authority,* 193 Md. 472, 67 A. 2d 490; *Masson v. Reindollar,* 193 Md. 683, 69 A. 2d 482; *Coddington v. Helbig,* 195 Md. 330, 73 A. 2d 454.

In this case there is no evidence of fraud or collusion. But complainants assert that the contract awarded by the Board of Education to Sutter is void because it was in violation of that section of the Maryland Public Education Law which requires competitive bidding on con-

tracts. This section, enacted by the Legislature of Maryland in 1933, provides as follows: "Where the cost of any school building, improvement, supplies or equipment of any sort exceeds the sum of one thousand dollars, the Board of Education in each county shall advertise for bids in one or more newspapers published in their respective counties, publication of such advertisement to appear at least one week prior to the date on which bids are to be filed, and the contract for any such school building, improvement, supplies or other equipment shall be awarded to the lowest responsible bidder, but the Board of Education in the respective counties shall have the right to reject any and all bids and to re-advertise for other bids, and any contract entered into or purchase made in violation of the provisions of this section shall be null and void; provided, however, that the provisions of this section shall not apply to contracts for the purchase of books and/or other materials of instruction, * * * and provided further that nothing in this section shall apply to emergency repairs during the period of the regular school year." Laws 1933, ch. 151, Code 1939, art. 77, sec. 62.

In 1949 the Legislature at its regular session authorized the County Commissioners of Wicomico County to issue bonds in the amount of $1,200,000 for the construction of a high school for white children near the eastern limits of Salisbury and a high school for colored children near its northern limits. Laws 1949, ch. 293. At the same session the Legislature authorized the creation of a State debt in the amount of $20,000,000, from which it was agreed that approximately $370,000 was available as a grant from the State toward the cost of construction of the two high schools. Laws 1949, ch. 502. At the extra session in December, 1949, the Legislature authorized the creation of a State debt of $50,000,000 to supplement the financing of the construction of public school buildings and facilities in the State. Laws 1949, Extra Sess., ch. 1. In 1951 the Legislature authorized the Wicomico County Commissioners to issue bonds in the

amount of $700,000 to aid in the construction of the two schools. Laws 1951, ch. 224.

Pursuant to these Acts, the Board of Education in 1951 advertised for sealed bids for the construction of five buildings for the high school for white children. The five buildings were intended for classrooms, science, cafeteria, library, and power plant. The Board opened the bids on July 10. The lowest bid was $1,984,145, submitted by Sutter. The next lowest was $2,033,233, submitted by J. Roland Dashiell & Sons, of Salisbury. On July 13 the Board awarded the contract to Sutter, subject to approval of the County Commissioners within thirty days. The Board, its architects and Sutter executed the contract, which was the Standard Form of Agreement between Contractor and Owner for Construction of Buildings, issued by the American Institute of Architects.

The contract was approved by Dr. Thomas G. Pullen, Jr., State Superintendent of Schools. But the County Commissioners, believing that $1,984,145 was more than the County could afford to pay for construction of this school, informed the Board of Education that they would not appropriate that amount. Thereupon the Board of Education conferred with Sutter and the architects, and it was proposed at the conference to eliminate the library building by putting the libary in the cafeteria building. By so doing, Sutter consented to reduce his bid to the extent of $210,840. By making other changes in the specifications, he consented to reduce his bid further to the extent of $94,817. On August 7 the Board, without any readvertisement for bids, awarded Sutter the contract to construct the four buildings for $1,678,488.

The statute directing each County Board of Education to award contracts to the lowest responsible bidder is mandatory. It requires the Board to advertise for bids whenever the cost of any building, improvement, supplies or equipment, except books and materials of instruction, exceeds $1,000, and declares that any contract made in violation of this provision shall be null and

void. The object of this statute is to obtain unrestricted competitive bidding for contracts for the construction and repair of public school buildings, and thereby to safeguard public funds by preventing favoritism, collusion and extravagance. *Packard v. Hayes,* 94 Md. 233, 249, 51 A. 32. In order to attain that object, it is indispensable that all bidders be put on terms of equality and be permitted to bid on substantially the same proposition. Hence, the plans and specifications of a contract should be available to all persons who desire to bid thereon to enable them to compete on a uniform basis and without favoritism. *Folkers v. Butzer,* 294 Ill. App. 1, 13 N. E. 2d 624; *Best v. City of Omaha,* 138 Neb. 325, 293 N. W. 116.

Of course, the statutory requirement should not be construed so strictly as to divest a Board of Education of the right to make minor changes in specifications after a contract has been awarded. If the Board had no latitude whatever in authorizing changes in materials when necessary or desirable, the public interest might be jeopardized in the event of emergencies or unforeseen obstacles. This was pointed out by the Supreme Court of Oregon in the case of *Pyle v. Kernan,* 148 Or. 666, 36 P. 2d 580, 584. There the State Highway Commission had called for bids on a contract to resurface a road and to furnish a certain amount of broken stone for the purpose. The specifications called for Tupper rock; but when the plaintiffs, who were the successful bidders, began the work, they found to their surprise and dismay that Tupper rock was so hard that it was not practicable to crush it for the purpose of road construction. Negotiations culminated in a meeting at which it was agreed that the defendant would take over the contract if he could substitute Umpqua gravel for Tupper rock. The Court, in holding that the change was not contrary to public policy, made the following comment: "The change made by the commission—which we think was in furtherance of the public interest—was by virtue of the contract awarded to plaintiffs and assigned to the de-

fendant. In our opinion it was not a case of making a new contract. There was no change in the materials used in the construction work. Umpqua gravel is as much rock as is the material taken from the Tupper quarry. * * * There was no change in the general plan of construction and the same kind of material, viz., rock, went into the construction work. * * * The state received the full benefit of competitive bidding and there was no attempt to evade the law."

On the other hand, the competitive bidding statute is plain and explicit and was enacted by the Legislature for the benefit of the public, and accordingly any private agreement which tends to prevent or restrict competition, or any scheme which has the effect of promoting favoritism, circumvents the statute and is contrary to the public policy of the State. *Youmans v. Everett,* 173 Mo. App. 671, 160 S. W. 274; *Siegel v. City of Chicago,* 223 Ill. 428, 79 N. E. 280. The Board of Education, like any other administrative agency charged with the duty of letting contracts, should endeavor to obtain the best possible competition under the circumstances of each particular case. The generally accepted rule is that where a statute requires that a contract for public work shall be let to the lowest responsible bidder, a municipal corporation or administrative agency cannot evade the law by making substantial changes in the contract after it has been awarded pursuant to the law. In short, the municipality or agency cannot do indirectly what it is prohibited from doing directly. *Lassiter & Co. v. Taylor,* 99 Fla. 819, 128 So. 14, 69 A. L. R. 689.

In Michigan a contract for paving was let after competitive bidding. It being ascertained that gutters should be laid at the same time, the contractor for the paving was given the contract without competitive bidding. It was contended that this addition was legal under the power of the City Council to make assessment for any extra work needed to be done. The Court held, however, that the gutter work was a new undertaking and neces-

sitated advertisement for competitive bidding. *Ely v. City of Grand Rapids*, 84 Mich. 336, 47 N. W. 447.

In California a contract for grading a street was let after competitive bidding. After the contract was awarded, the commissioners changed the grade line of the street so that a less amount of grading was needed, and a consequent reduction in price was made. The Court held that if, after the contract has been awarded, the nature of the improvement or the amount of the work can be changed, then the property owners are deprived of the benefit of competitive bidding, and therefore the contract was rendered inoperative. *Warren v. Chandos*, 115 Cal. 382, 47 P. 132.

We adopt the rule promulgated by the Supreme Court of Pennsylvania in 1923 in *Hibbs v. Arensberg*, 276 Pa. 24, 119 A. 727, that deviations from a contract awarded for the construction of a public school building must be based upon honest, reasonable and intelligent judgment and must not vary so substantially from the original plan as to constitute a new undertaking, where fairness could be secured only by competitive bidding.

Tested by this criterion, the contract which the Board of Education awarded to Sutter was in violation of the statute. In the first place, the variation in the general plan of construction was substantial, for it reduced the number of structures contracted for from five to four. This, according to Sutter, made a difference in cost of $210,840. Furthermore, it was not explained why the elimination of one of the five buildings, by the plan of putting the library in the cafeteria building, would reduce the cost of construction less than 11 per cent.

When we hold in mind the statutory requirement that the Board must advertise for bids for any improvement that costs more than $1,000, we can see how the Board's private arrangement with Sutter circumvented the statute from the plan to build a partition in the cafeteria building, to separate the library from the cafeteria, for $1,610. We do not mean to hold that every change in a contract that costs more than $1,000 would require re-

advertisement for bids. The illustration is only one of numerous modifications of considerable magnitude. For it is undisputed that, in addition to the reduction of $210,840 by the elimination of the library building, there would be a further reduction of $94,817 due to various omissions and substitutions of materials, making a total reduction of $305,657.

While we realize that J. Roland Dashiell, the second lowest bidder, who testified in the Court below, had the advantage of comparing the bids after they had been opened, nevertheless we cannot close our eyes to the fact that Dashiell, who has been in the contracting business more than 40 years and has had the experience of building a number of school buildings in Maryland and Delaware, declared that he was willing and ready to do the work for $25,000 less than Sutter. His testimony at least fortifies the claim that fairness could be secured only by competitive bidding. A readvertisement for bids would not have been unfair to Sutter, for he is presumed to know the law that the Board of Education has the right to reject any and all bids and to readvertise for other bids. The rule is firmly established that one who makes a contract with a municipal corporation or administrative agency is bound to take notice of the limitations of its powers to contract. *Gontrum v. Mayor and City Council of Baltimore*, 182 Md. 370, 375, 35 A. 2d 128.

The parties disputed at great length what the administrative practice of County Boards of Education has been since 1933 in modifying plans and specifications after making awards of contracts. It was not made clear how much latitude the County Boards have exercised in making changes when found necessary or desirable. However, we are certain that no Board, regardless of local custom, has the right to ignore or circumvent the mandate of the Legislature. As we said in *Rogan v. Baltimore & Ohio R. Co.*, 188 Md. 44, 58, 52 A. 2d 261, 268, no custom, however venerable, can nullify the plain meaning and purpose of a statute.

58

As we find that the contract was in violation of the statute, it follows that it is null and void. We must, therefore, reverse the decree declaring the contract valid and dismissing the bill of complaint, and remand the case for the passage of a decree enjoining the Board from constructing the buildings in accordance with the contract.

> *Decree reversed and case remanded for the passage of a decree in accordance with this opinion, with costs.*